AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

3/23/2023

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

4320 DALEVIEW AVENUE, DAYTON, OHIO 45404
AND THE SURROUNDING CURTILAGE

)
)
)
)
)
)

Case No.    3:23-mj-106

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Possession with intent to distribute narcotics and conspiracy to commit the same. |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Robert Buzzard, FBI SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____Telephone_____ *(specify reliable electronic means).*

Date:    March 23, 2023

City and state:    Dayton, Ohio

Caroline H. Gentry
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Robert Buzzard, hereby duly sworn, declare and state:

## INTRODUCTION

1.      I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency.   I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878.   Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2.      I have served as an FBI SA since January 2002.   I am currently assigned to the Cincinnati Division, Dayton Resident Agency and serve on the FBI's Southern Ohio Safe Streets Task Force (SOSSTF).   Since 2002, I have participated in investigations involving narcotics trafficking and have received specialized training on the subject of narcotics trafficking and money laundering from the FBI.   I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions.   Based on my training and experience – including my participation in the investigations referenced above – as well as discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug traffickers and their organizations operate within the United States.   Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

      a.      It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

1

b.      It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c.      That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d.      It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.      It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f.      It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g.      It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h.      That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i.      When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j.      Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k.      It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their

2

associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m. Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n. Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o. The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p. Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r.      I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone."   The money phone is used primarily to communicate with those customers.  The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed.  The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point.  Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3.      I make this affidavit in support of applications for search warrants for the following residence and vehicles – namely:

a.      4320 Daleview Ave. Dayton, Ohio 45405, including any outbuildings, garages, or sheds located on its curtilage (hereinafter referred to as: "**Daleview House**"). **Daleview House** is described more fully in Attachment A, which is incorporated herein by reference;

b.      4317 Riverside Dr. Apt. H1, Dayton, Ohio 45405 (hereinafter referred to as "**Riverside Apartment**").  **Riverside Apartment** is described more fully in Attachment A-1, which is incorporated herein by reference;

c.      2017 Buick sedan, black in color, Ohio license plate JZD2423, Vehicle Identification Number (VIN) 1G4ZR5559HU181709 (hereinafter "**Vehicle 1**").  **Vehicle 1** is described more fully in Attachment A-2, which is incorporated herein by reference;

d.      2012 Jeep Grand Cherokee, black in color, Ohio license plate number HZX3066, Vehicle Identification Number (VIN) 1C4RJFCT1CC221879 (hereinafter **"Vehicle 2"**).  **Vehicle 2** is described more fully in Attachment A-3, which is incorporated herein by reference.

4.     As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside the **Daleview House, Riverside Apartment** , **Vehicle 1 and Vehicle 2**– namely:

a.     Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, and

b.     Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

5.     A list of specific items to be seized from the premises and vehicles described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.   Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at/in the premises and vehicles described above.   I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with above-described drug trafficking offenses is located at the **Daleview House, Riverside Apartment** and inside **Vehicle 1** and **Vehicle 2**.

## **PROBABLE CAUSE**

6.     This affidavit details an investigation into the drug trafficking activities of Terrion GILLIARD (hereinafter GILLIARD) and his associates in the Dayton, Ohio area between approximately September 2022 and the present day.   The investigative team is comprised of local, state, and federal law enforcement officials from the Warren County Ohio Drug Task Force, FBI Dayton, and FBI London, Kentucky.     As detailed below, the investigative team utilized Confidential Sources and undercover law enforcement officials to conduct controlled purchases of

large quantities of methamphetamine from GILLIARD over approximately the past seven months. Physical surveillance by members of the investigative team in and around the controlled drug buys identified two drug stash houses utilized by GILLIARD (**Daleview House** and **Riverside Apartment**). Surveillance also identified vehicles utilized by GILLIARD and others to transport narcotics and drug sale proceeds (**Vehicle 1** and **Vehicle 2**).

7.      In or around September 2022, members of the Warren County Ohio Drug Task Force received information from a Confidential Source, hereinafter referred to as CS1. CS1 identified GILLIARD as a large-scale methamphetamine trafficker operating in the Dayton/Montgomery County area.

8.      During the second week of September 2022, task force members utilized CS1 to arrange for a covert/undercover purchase of methamphetamine from GILLIARD in Dayton, Ohio. CS1 placed a pre-buy cellular telephone call to GILLIARD and arranged for the purchase of an amount of methamphetamine. GILLIARD directed CS1, who was accompanied by Task Force Officer (TFO) Greg Spanel working in an undercover capacity, to an apartment building located at 4317 Riverside Dr., Dayton, Ohio. CS1 and TFO Spanel drove to the Riverside Dr. apartment building and parked in the parking lot. TFO Spanel observed GILLIARD exit a Chrysler 300 sedan in that same parking lot and walk over to the vehicle CS1 and TFO Spanel occupied. GILLIARD entered that vehicle and produced a bag containing suspected methamphetamine. GILLIARD traded CS1 and TFO Spanel the methamphetamine for pre-recorded law enforcement buy funds. TFO Spanel is both a certified peace officer in the State of Ohio and a federally deputized TFO through the FBI. Following the transaction, the suspected methamphetamine was field tested by task force members and showed a positive test for methamphetamine.

9.      During the first week of November 2022, CS1 reported to task force members a

conversation CS1 had with GILLIARD. During that conversation, GILLIARD told CS1 he received a 30-pound box (referring to the amount of methamphetamine) and was "back on" (meaning he had methamphetamine for sale). Following that conversation, task force members arranged for a second purchase of methamphetamine from GILLIARD in the same week. CS1 contacted GILLIARD via cellular telephone and ordered multiple ounces of methamphetamine. GILLIARD agreed to the sale and directed CS1 to a business parking lot in Harrison Township, Ohio. CS1 was searched for contraband, provided pre-recorded law enforcement buy funds, and outfitted with a wireless transmitter for task force members to monitor the narcotics transaction in real time. CS1 traveled to the pre-determined parking lot and met with GILLIARD who arrived in the same Chrysler 300 sedan. This time, GILLIARD had an unknown male passenger in the car with him. CS1 provided GILLIARD with the pre-recorded law enforcement buy funds and GILLIARD provided CS1 with several ounces of suspected methamphetamine. Following the transaction, CS1 provided the suspected methamphetamine to task force members. The suspected methamphetamine was field tested by task force members and tested positive for the presence of methamphetamine.

10.     During the third week of January 2023, task force members arranged a third purchase of methamphetamine from GILLIARD. TFO Spanel (working in an undercover capacity) spoke directly to GILLIARD via cell phone and arranged the purchase of multiple ounces of methamphetamine. GILLIARD directed TFO Spanel to the parking lot near 4335 Riverside Dr., Dayton, Ohio, which is the same apartment complex where the **Riverside Apartment** is located. TFO Spanel traveled to the location outfitted with an electronic transmitter/recorder. GILLIARD showed up to the parking lot driving the same Chrysler 300, bearing Ohio license plate number JVQ2465, and parked next to TFO Spanel. GILLIARD entered TFO Spanel's vehicle

and provided TFO Spanel several ounces of suspected methamphetamine in exchange for pre-recorded law enforcement buy funds. The suspected methamphetamine was field tested by task force members and tested positive for the presence of methamphetamine.

11.     During the last week of January 2023, task force members arranged a fourth purchase of methamphetamine from GILLIARD. TFO Spanel (working in an undercover capacity) arranged the drug transaction directly with GILLIARD via cell phone. TFO Spanel was again directed by GILLIARD to the parking lot near 4335 Riverside Dr., Dayton, Ohio to complete the transaction. GILLIARD arrived at the parking lot driving a black Buick sedan, bearing Kentucky temporary license plate number B721741 (**Vehicle 1**). TFO Spanel noticed a male passenger in the vehicle with GILLIARD, later identified by TFO Spanel as Deandre CAMPBELL (hereinafter CAMPBELL). GILLIARD parked next to TFO Spanel's vehicle and rolled his passenger side window down. TFO Spanel watched GILLIARD retrieve a baggie containing suspected methamphetamine from his front hoody pocket and hand it to CAMPBELL. CAMPBELL then handed the suspected methamphetamine to TFO Spanel in exchange for pre-recorded law enforcement buy funds. Following the transaction, task force members surveilled GILLIARD back to the **Daleview House** where he backed into the driveway and parked next to a silver/gray Audi sedan, bearing Ohio temporary license plate number Q315136. The suspected methamphetamine was field tested by task force members and tested positive for the presence of methamphetamine.

12.     Your affiant researched Montgomery County Ohio Auditor's records and learned CAMPBELL is the listed owner of the **Daleview House**. Records indicate CAMPBELL purchased the residence in May 2022.

13.     On February 1, 2023, task force members conducted spot checks at the **Daleview**

**House** and the **Riverside Apartment**. Investigators observed the silver/gray Audi sedan parked next to the **Riverside Apartment**. Task force members then drove by the **Daleview House** and observed **Vehicle 1** parked in the driveway.

14. During the second week of February 2023, task force members arranged a fifth purchase of several ounces of methamphetamine from GILLIARD. TFO Spanel (working in an undercover capacity) arranged the drug transaction directly with GILLIARD via cell phone. TFO Spanel was again directed by GILLIARD to the parking lot near 4335 Riverside Dr., Dayton, Ohio to complete the transaction. Prior to the transaction, task force members established surveillance at the **Daleview House** and noted **Vehicle 1** parked in the driveway. Task force members watched GILLIARD exit the front door of the **Daleview House** and enter the driver's seat of **Vehicle 1**. GILLIARD drove directly to the meet location and pulled up next to TFO Spanel's vehicle. GILLIARD entered TFO Spanel's vehicle and handed him a baggie of suspected methamphetamine. TFO Spanel handed GILLIARD pre-recorded law enforcement buy funds. GILLIARD exited TFO Spanel's vehicle and re-entered **Vehicle 1**. GILLIARD drove directly back to the **Daleview House** and parked **Vehicle 1** in the driveway. The suspected methamphetamine was field tested by task force members and tested positive for the presence of methamphetamine.

15. Based on my training and experience, as well as the events described above, I believe GILLIARD left the **Daleview House** where he retrieved the methamphetamine, which he then sold TFO Spanel. I believe that, upon completing the transaction, GILLIARD returned to the **Daleview House** with the pre-recorded law enforcement buy funds.

16. During the second week of February 2023, law enforcement officials from the London, Kentucky FBI accompanied a Confidential Source (hereinafter referred to as CS2) to

Dayton, Ohio for the purpose of conducting a controlled purchase of methamphetamine from GILLIARD. CS2 has provided law enforcement officials in Kentucky truthful and reliable information in the past, which was corroborated by independent information/investigation. CS2 has personally known GILLIARD for over one year and knew GILLIARD to sell large quantities of methamphetamine in the Dayton, Ohio area. CS2 contacted GILLIARD via cell phone and ordered over one pound of methamphetamine. GILLIARD agreed to the transaction and ultimately directed CS2 to the parking lot directly next to the **Riverside Apartment**. Task force members established surveillance at the **Riverside Apartment** and the **Daleview House** prior to the drug transaction. Surveillance members witnessed GILLIARD arrive at the **Daleview House** driving **Vehicle 1** and park in the driveway. The silver/gray Audi was also observed parked at the **Daleview House**. GILLIARD entered the silver/gray Audi and drove to the parking lot directly next to the **Riverside Apartment**. GILLIARD parked near CS2's vehicle and ultimately entered CS2's vehicle. GILLIARD provided CS2 over one pound of suspected methamphetamine and CS2 provided GILLIARD law enforcement buy funds. Following the transaction, CS2 met with law enforcement officials and relinquished the suspected methamphetamine. Surveillance members continued to follow GILLIARD after the drug transaction. GILLIARD drove to a car lot on N. Dixie Dr., Dayton, Ohio before returning to the **Daleview House**. The suspected methamphetamine was field tested by Kentucky task force members and tested positive for the presence of methamphetamine.

17. On February 23, 2023, your affiant conducted surveillance at the **Daleview House**. During surveillance, I observed a black 2012 Jeep Grand Cherokee, Ohio license plate number HZX3066 (hereinafter **Vehicle 2**) parked in the driveway of the residence. **Vehicle 2** is registered to a known female whose boyfriend is currently under federal investigation for drug trafficking

offenses. As is common with drug traffickers, they will oftentimes drive vehicles not registered in their name to hide their identity from law enforcement during their drug trafficking activities. **Vehicle 2** left the **Daleview House** and drove directly to the parking lot next to the **Riverside Apartment.** **Vehicle 2** backed into a parking spot and the driver remained inside the vehicle for several minutes. Surveillance terminated prior to the driver exiting **Vehicle 2**.

18.     During the last week of February 2023, London, Kentucky FBI officials utilized CS2 to conduct a second purchase of methamphetamine from GILLIARD.   CS2 contacted GILLIARD via cell phone and ordered over one pound of methamphetamine.   GILLIARD agreed to the transaction and ultimately directed CS2 to the parking lot directly next to the **Riverside Apartment**.  Task force members established surveillance at the **Riverside Apartment** and the **Daleview House** prior to the drug transaction.   Your affiant noted **Vehicle 2** parked in the lot near the **Riverside Apartment**.  CS2 arrived in the parking lot next to the **Riverside Apartment** and notified GILLIARD via cell phone.   Your affiant observed GILLIARD'S brother, Jalen GILLIARD (hereinafter JALEN), exit the area of the **Riverside Apartment** and walk to CS2's vehicle.  JALEN entered the vehicle and was in cellular telephone communication with his brother, GILLIARD during the drug transaction with CS2.   JALEN provided CS2 over one pound of methamphetamine and CS2 provided JALEN law enforcement buy funds.   Following the transaction, JALEN entered **Vehicle 2** and drove back to the **Daleview House** and entered the residence.   Approximately two minutes later, task force members observed CAMPBELL exit the front door of the **Daleview House**.  CAMPBELL walked around in the front yard before re-entering the residence.   The suspected methamphetamine JALEN sold to CS2 was field tested by Kentucky task force members and tested positive for the presence of methamphetamine.

19.     Based on my training and experience, as well as the events described above, I

believe the methamphetamine JALEN sold CS2 was being stored inside and retrieved from the **Riverside Apartment**.  I believe that upon completing that transaction, JALEN transported the cash proceeds back to the **Daleview House** where he proceeded to take inside of that location for storage and/or safekeeping.  I believe **Vehicle 2** was utilized during the drug transaction to transport and store both methamphetamine and drug proceeds.

20.     During the second week of March 2023, TFO Spanel (working in an undercover capacity) arranged another multiple ounce purchase of methamphetamine from GILLIARD.  TFO Spanel contacted GILLIARD via cell phone and was directed to the parking lot near 4335 Riverside Dr., Dayton, Ohio to complete the transaction.  Prior to the transaction, task force members established surveillance at the **Daleview House** and the **Riverside Apartment**.  During surveillance, task force members observed GILLIARD and CAMPBELL exit the **Daleview House**.  GILLIARD entered **Vehicle 1** (previously displaying a Kentucky temporary license plate, but now displaying Ohio license plate number JZD2423 registered to GILLIARD).  GILLIARD drove **Vehicle 1** to the **Riverside Apartment** and parked.  Task force members watched GILLIARD exit his vehicle and utilize a key to access the **Riverside Apartment**.  GILLIARD remained inside the **Riverside Apartment** for a brief moment before exiting and meeting with TFO Spanel.  GILLARD provided TFO Spanel several ounces of suspected methamphetamine in exchange for pre-recorded law enforcement buy funds.  Following the transaction, GILLIARD drove **Vehicle 1** directly back to the **Daleview House** and entered the residence.  The suspected methamphetamine was field tested by task force members and tested positive for the presence of methamphetamine.

21.     Based on my training and experience, as well as the events described above, I believe the methamphetamine GILLIARD sold TFO Spanel was being stored inside and retrieved

from the **Riverside Apartment**. I believe that upon completing that transaction, GILLIARD transported the cash proceeds back to the **Daleview House** where he proceeded to take inside of that location for storage and/or safekeeping. I believe **Vehicle 1** was utilized during the drug transaction to transport and store both methamphetamine and drug proceeds.

22.    Your affiant obtained rental records for the **Riverside Apartment** and learned the current lessee was Taylor Watson. A background check on Watson showed one contact with Dayton Police in April of 2022 regarding a stolen vehicle recovered in the parking lot of the **Riverside Apartment**. During that police contact, Watson identified her telephone number and reported she was GILLIARD'S girlfriend. A review of GILLIARD'S subpoenaed cell phone records identified frequent contact with Watson's telephone number. Cell phone records showed GILLIARD'S cell phone number and Watson's cell phone number communicated 552 times between February 1, 2022 and February 5, 2023.

23.    During the third week of March 2023, London, Kentucky FBI officials utilized CS2 to conduct a third purchase of methamphetamine from GILLIARD. CS2 contacted GILLIARD via cell phone and ordered over one pound of methamphetamine. GILLIARD agreed to the transaction and ultimately directed CS2 to the parking lot directly next to the **Riverside Apartment**. Task force members established surveillance at the **Riverside Apartment** and the **Daleview House** prior to the drug transaction. Your affiant observed **Vehicle 1** and **Vehicle 2** parked in the parking lot next to the **Riverside Apartment**. Shortly after CS2 arrived in the parking lot, GILLIARD and JALEN exited the **Riverside Apartment**. GILLIARD entered CS2's vehicle and JALEN entered **Vehicle 1**. GILLIARD retrieved more than one pound of suspected methamphetamine from his coat pocket and provided it to CS2 in exchange for law enforcement buy funds. Following the transaction, GILLIARD entered **Vehicle 1** with JALEN

and left the area. The suspected methamphetamine was field tested by Kentucky task force members and tested positive for the presence of methamphetamine.

24. Based on my training and experience, as well as the events described above, I believe the methamphetamine GILLIARD sold CS2 was being stored inside and retrieved from the **Riverside Apartment**. I believe the cash proceeds from the methamphetamine sale were then transported and/or stored inside **Vehicle 1**.

25. On March 20, 2023, your affiant conducted a spot check at the **Daleview House**. I observed GILLIARD and CAMPBELL exit the residence together and enter a small sedan parked in the front yard. The small sedan then left the area.

26. On March 21, 2023, your affiant reviewed CAMPBELL's publicly viewable social media account. I noted a photograph of CAMPBELL posted on March 20, 2023. The photo depicted CAMPBELL standing in the front yard of the **Daleview House** with a handgun sticking out of his pants pocket. Approximately two weeks ago, CAMPBELL posted another photograph on the same social media account of him standing inside a residence. A large quantity of U.S. currency is laying on the floor next to CAMPBELL, which affiant knows through training and experience is indicative of drug proceeds.

///

///

///

///

///

## **CONCLUSION**

27.     Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking offenses are located within the **Daleview House** and surrounding curtilage, the **Riverside Apartment**, and **Vehicles 1 and 2**.

_Robert M. Buzzard_

Robert Buzzard
Special Agent
Federal Bureau of Investigation

By reliable electronic means (telephone)

Sworn and subscribed before me on this
__23rd__ day of March 2023.

Caroline H. Gentry
United States Magistrate Judge

<u>ATTACHMENT A</u>

**Daleview House:** The place to be searched is 4320 Daleview Ave., Dayton, Ohio 45404 and the surrounding curtilage.   4320 Daleview Ave, Dayton, Ohio 45404 is a one-story single-family residence constructed of tan siding. The numbers "4320" are affixed on the front of the residence, right of the front door.   4320 Daleview Ave., Dayton, Ohio is further depicted in the following photograph.



E20 17007 0026  10/11/2012

ATTACHMENT A-1

**Riverside Apartment**:   4317 Riverside Dr., Dayton, Ohio is a multi-unit apartment building constructed of gray siding and red brick.   The numbers "4317" appear on the southeast corner of the apartment building.   Apartment H1 is located within the 4317 Riverside Dr., Dayton, Ohio apartment building on the southwest portion of the first floor.   The front door to Apartment H1 is green in color with "H1" displayed on the top center portion of the door.



<u>ATTACHMENT A-2</u>

**Vehicle 1:**   2017 Buick sedan, black in color, Ohio license plate JZD2423, Vehicle Identification Number (VIN) 1G4ZR5559HU181709.

<u>ATTACHMENT A-3</u>

**Vehicle 2:**  2012 Jeep Grand Cherokee, black in color, Ohio license plate number HZX3066, Vehicle Identification Number (VIN) 1C4RJFCT1CC221879.

## <u>ATTACHMENT B</u>

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A.   Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B.   Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.   Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D.   Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.   Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F.   United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.   Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H.   Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I.   Illegal drugs, including but not limited to methamphetamine and fentanyl and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J.   Firearms and ammunition.